UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA     :    SEALED
                                  :    INDICTMENT

     -v-                    :

RANDY CROWELL,             :    15 Cr.
  a/k/a "Roger,"         :

               Defendant.

**15 CRIM 840**

- - - - - - - - - - - - - - - - - - X

COUNT ONE

(Conspiracy to Commit Healthcare Fraud)

The Grand Jury charges:

INTRODUCTION

    1.    From in or about 2010, up to and including in or about July 2012, in the Southern District of New York and elsewhere, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown conspired to defraud health care benefit programs of hundreds of millions of dollars through a scheme to traffic prescription drugs in a national, underground market. As detailed further below, the prescription drugs involved in this scheme were designed to treat various illnesses, including, for example, HIV/AIDS, schizophrenia, and asthma. These medications were valuable to scheme participants because health care benefit programs, such as private insurance companies or Medicaid, pay hundreds and even thousands of dollars for each new, legitimate

bottle of medication dispensed by pharmacies to individuals covered by the plans.

2.   To effectuate the scheme, RANDY CROWELL, a/k/a "Roger," the defendant, through a Utah-based wholesale distribution company under his control ("Wholesaler-1"), purchased tens of thousands of bottles of prescription medication from illegitimate sources through this underground market and then sold these medications as "new" to pharmacies. In turn, these pharmacies dispensed those medications to patients and billed health care benefit plans for the full value of the medications.  CROWELL and his co-conspirators profited by exploiting the difference between the cost of obtaining drugs from this underground market – which was typically a fraction of their value on the legitimate market – and the full price health care benefit programs paid once these seemingly "new" drugs were dispensed to unsuspecting patients.  The scheme relied on numerous material misrepresentations, including misrepresentations CROWELL made to pharmacies and others about the source of the prescription medications that he and Wholesaler-1 sold.

3.   As detailed below, the scheme was potentially dangerous to the tens of thousands of patients ultimately receiving and taking the prescription drugs.  Many of the bottles purchased through the underground market and then

2

distributed as safe, legitimate medications by RANDY CROWELL, a/k/a "Roger," the defendant, and Wholesaler-1 had in fact been previously dispensed to others, including individuals based in the Southern District of New York; these bottles had then been "cleaned" with hazardous chemicals such as lighter fluid to conceal the fact that they had been previously dispensed; and these bottles of medication were then transported and stored in conditions that were frequently insanitary and insufficient to ensure the safety and efficacy of the medication.

4.   The scheme was highly profitable. In total, between in or about 2010 and in or about July 2012, RANDY CROWELL, a/k/a "Roger," the defendant, and Wholesaler-1 purchased more than $100 million worth of these second-hand drugs which CROWELL then sold to pharmacies all over the country.  Health care benefit programs, in turn, paid for these drugs as if they were "new" and at prices considerably in excess of the prices CROWELL paid to buy these medications off of the underground market. CROWELL's profit was the difference between the reduced prices he paid to purchase these drugs from the underground market, and the full or close to full price he could charge pharmacies for what they believed to be new, legitimate medications. During this period, CROWELL personally reaped approximately $16 million in profits from his participation in the scheme.

BACKGROUND ON PRESCRIPTION DRUGS

5.    Prescription drugs are an essential part of modern health care in the United States. Because of their critical role in the treatment of patients – and the need to avoid contamination or adulteration – the movement, storage, and sale of prescription drugs is carefully regulated.  First, manufacturers set careful standards for the safe handling and storage of prescription medications.  For example, many of the HIV/AIDS medications relevant to the scheme described in this Indictment must be stored at precise temperatures.  A failure to comply with these standards may impact the efficacy of the drug and the safety of the patient to whom it is dispensed.

6.    To ensure their safety, prescription drugs are typically sent from the manufacturer to one of only a handful of "Authorized Distributors" who, in turn, will either sell the prescription drugs directly to a pharmacy, or will sell those medications to licensed wholesale distributors who, in turn, will sell the medications to pharmacies so that the medications can ultimately be dispensed to patients.  Only a properly licensed business may engage in the wholesale distribution of prescription medications – that is, may purchase medications in bulk and sell them directly to a pharmacy, which in turn, must be licensed to dispense those medications to a patient.

7.   In order to protect the integrity of this supply chain for what are frequently life-saving medications, Federal regulations also require that "[b]efore the completion of any wholesale distribution by a wholesale distributor of a prescription drug . . . to another wholesale distributor or retail pharmacy, the seller shall provide to the purchaser a statement identifying each prior sale, purchase, or trade of such drug." 21 C.F.R. § 203.50(a).  This written statement, known as a "pedigree," is required to detail "the business name and address of all parties to each prior transaction involving the drug, starting with the manufacturer; and . . . the date of each previous transaction." 21 C.F.R. § 203.50(a).

## RELEVANT ENTITIES AND INDIVIDUALS

8.   At all times relevant to this Indictment, RANDY CROWELL, a/k/a "Roger," the defendant, was the owner and operator of Wholesaler-1, a licensed wholesale distributor of prescription medications based in St. George, Utah.  Over the course of the time period relevant to this Indictment, Wholesaler-1 purchased tens of thousands of bottles of medications from illegitimate sources, including many of the co-conspirators mentioned herein.  In furtherance of the scheme, CROWELL recruited employees to participate in the trafficking of drugs from the underground market, including a co-conspirator not named as a defendant herein ("CC-1"), who, from in or about

2010 up to and including in or about November 2011, worked as a warehouse manager for Wholesaler-1.

9.     At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2") was a Texas-based high-level aggregator of diverted drugs bought and sold on the underground market described herein, and a primary supplier to RANDY CROWELL, a/k/a "Roger," the defendant, and Wholesaler-1. As a part of the scheme, CC-2 caused to be incorporated at least five front or "shell" companies that purported to be licensed, legitimate distributors of prescription drugs (the "Corrupt Distribution Companies"). CC-2 also recruited co-conspirators to serve as the license holders of the Corrupt Distribution Companies, including two co-conspirators based in Sugarland, Texas ("CC-3" and "CC-4," respectively).

<u>THE SCHEME TO DEFRAUD</u>

10.     The participants in the fraudulent scheme detailed herein carried out the scheme by distorting the legitimate flow of medications from manufacturer to pharmacy, as described above. Rather than purchasing medications from legitimate authorized distributors at full price, scheme participants, including RANDY CROWELL, a/k/a "Roger," the defendant, created and exploited an underground market for these same prescription drugs, thereby permitting CROWELL and others to buy these

6

medications at a fraction of their listed prices from illegitimate sources, before attempting to sell them under false pretenses as new, legitimate medications to pharmacies at full price.  Pharmacies, in turn, dispensed these medications to unknowing patients, billing their health care benefit programs for the full cost of these black market drugs as if they were new.

11.  To reap maximum profits, the scheme participants targeted the most expensive drugs – that is, the drugs for which health care benefit programs would pay the most – including, drugs such Atripla, Trizivir, Zyprexa, Truvada, all of which had health care benefit program reimbursement values in excess of $1,000 per bottle during all times relevant to this Indictment.

                      The Black Market

12.  Because the scheme focused on maximizing the profit to corrupt wholesalers and distributors of prescription medications, participants targeted the cheapest possible source of supply for these drugs – Medicaid patients and other individuals who received these prescription drugs on a monthly basis for little or no cost, and who were then willing to sell their medicines rather than taking them as prescribed (the "Insurance Beneficiaries").

13. Insurance Beneficiaries had prescriptions filled for medications each month at pharmacies across the country, including in Manhattan and the Bronx, and then sold those medications to low-level participants ("Collectors") in the scheme who worked on street corners and bodegas and would pay cash - typically as little as $40 or $50 per bottle - to buy these previously dispensed medications. To preserve the high value of these bottles - that is, to ensure they could ultimately be resold as "new" drugs obtained from legitimate sources - Collectors and other scheme participants used lighter fluid and other potentially hazardous chemicals to remove the patient labels affixed when the bottles were initially dispensed to the Insurance Beneficiaries. This process, referred to as "cleaning" the bottles, was essential to the scheme participants' ability ultimately to re-sell these bottles as new.

14. Collectors then sold these second-hand drugs to higher-level scheme participants ("Aggregators") who bought dozens, and sometimes hundreds, of bottles at a time from multiple collectors before selling them to higher level scheme participants with direct access to corrupt distribution channels, including CC-2. Participants like CC-2 then resold these bottles in bulk - typically hundreds, and sometimes thousands, at a time - to corrupt wholesale companies, including

8

Wholesaler-1. The corrupt wholesale companies, including Wholesaler-1, then resold the bottles as new to pharmacies, including potentially the very same pharmacies that initially dispensed these medications, at full price.

15. The scheme relied on material misrepresentations and omissions both on the front end, when Insurance Beneficiaries initially obtained prescription drugs and sold them on the street, and on the back end, when RANDY CROWELL, a/k/a "Roger," the defendant, and other corrupt wholesalers caused the second-hand drugs to be dispensed to unwitting consumers and paid for as new by unsuspecting health care benefit programs. On the front end, the scheme relied on the fact that Insurance Beneficiaries received their medications at little or no cost and were willing to sell those medications for pennies on the dollar to Collectors. Every major health care benefit program, including Medicaid, expressly prohibits a beneficiary from seeking reimbursement under such circumstances. Health care benefit programs would not have paid for the medications issued by pharmacies to the Insurance Beneficiaries had these health care benefit programs known that the Insurance Beneficiaries were selling their drugs to others, rather than taking them as prescribed.

16. On the back end of the scheme, participants purposefully concealed and misrepresented the true source of the

second-hand drugs to defraud pharmacies into buying these medications, patients into accepting these medications, and health care benefit programs into paying for these medications once dispensed to program or plan participants.

<u>RANDY CROWELL and "Wholesaler-1"</u>

17.    Central to the scheme's success – and, in particular, the scheme participants' ability to realize profits from these second-hand drugs – was the participation of corrupt, licensed wholesale distributors willing to buy these "second hand" medications at a fraction of their legitimate price and then resell them as new to pharmacies who would in turn dispense these medications to unsuspecting patients.  RANDY CROWELL, a/k/a "Roger," the defendant, and Wholesaler-1 were among the largest of these corrupt wholesalers.

18.  Between in or about 2010, when Wholesaler-1 was created by RANDY CROWELL, a/k/a "Roger," the defendant, and in or about July 2012, Wholesaler-1 had no legitimate sources of supply.  Instead, CROWELL caused Wholesaler-1 to purchase exclusively from sources like CC-2 and the Corrupt Distribution Companies, along with other similarly illegitimate sources which sold to CROWELL at substantially reduced rates, sometimes as much as 50 percent less than the price of acquiring these medications from legitimate sources.

19.   Consistent with their illegitimate origins, inbound shipments of prescription drugs frequently arrived at Wholesaler-1 improperly packaged in unsealed, insecure cardboard boxes.  On some occasions, bottles of medication arrived at Wholesaler-1 with the initial patient labels still affixed to them.  On other occasions, bottles arrived having already been opened, or containing what appeared to be the wrong medication. Moreover, inventories of these shipments would typically arrive at Wholesaler-1 from CC-2 by facsimile, as handwritten lists replete with Spanish-language spellings of certain drug names, or misspellings of others.

20.   At the direction of RANDY CROWELL, a/k/a "Roger," the defendant, employees of Wholesaler-1, including CC-1, then inventoried these bottles, attempted to remove any bottles which still had patient labels affixed to them or were otherwise visibly used or damaged, and then arranged for the medications to be shipped out to Wholesaler-1's customers – i.e., pharmacies all over the country, including pharmacies in Manhattan and the Bronx.  CROWELL's profit was the difference between the reduced prices he paid to purchase these drugs from CC-2 and the Corrupt Distribution Companies, among others, and the full or close to full price he could charge pharmacies for what they believed to be new, legitimate medications.

11

21.  To effectuate the scheme – and, in particular, to convince pharmacies to buy these medications and health care benefit programs to pay for them – RANDY CROWELL, a/k/a "Roger," the defendant, and others made false and fraudulent representations about the origins of these medications. Specifically, CROWELL and others acting at his direction created false and fraudulent pedigrees for these medications, which purported to document the legitimate movement of these medications bought and sold by Wholesaler-1 from a manufacturer to the pharmacy.  For example, typical pedigrees created by Wholesaler-1, and signed by CROWELL, indicated that the medications sold by Wholesaler-1 had come from one of the Corrupt Distribution Companies which had, in turn, purchased the medications from an Authorized Distributor.

22.  In truth and as RANDY CROWELL, a/k/a "Roger," the defendant, well knew, none of the Corrupt Distribution Companies controlled by CC-2 had purchased any of their medications from legitimate sources of supply, and the pedigrees created by Wholesaler-1 and signed by CROWELL were intentionally fabricated so that the medications could be sold, as new, to pharmacies and so that health care benefit programs would be duped into paying for these illegitimate second-hand drugs.  Indeed, as noted above, many of the medications supplied to CROWELL by CC-2 and the Corrupt Distribution Companies arrived bearing patent

12

indicia of their illegitimate origin, including patient labels, broken seals, and visible contamination.

23.   In order to evade detection, RANDY CROWELL, a/k/a "Roger," the defendant, and others, including CC-2, took various steps to conceal the unlawful nature of their activities.   For example, during the period of the conspiracies charged in this Indictment, CC-2 frequently changed the names of the Corrupt Distribution Companies CC-2 used to sell black market medications to CROWELL and Wholesaler-1.   CROWELL, in turn, frequently refused to pay CC-2 directly for his role in orchestrating the sales of black market medications, instead paying CC-2 through various entities under CROWELL's control.

24.   Similarly, so as to evade detection, RANDY CROWELL, a/k/a "Roger," the defendant, frequently used the alias "Roger" in dealing with CC-2 and the Corrupt Distribution Companies. CROWELL also frequently changed or "dropped" the phones he used to communicate with the Corrupt Distribution Companies and other scheme participants.

25.   To facilitate the fraudulent scheme described above, scheme participants used commercial interstate carriers to ship the second-hand drugs from places like New York City, where they were initially purchased from Insurance Beneficiaries, to scheme participants based in Florida, Texas, and Mississippi, among other places, who in turn used commercial interstate carriers to

ship the second-hand drugs to RANDY CROWELL, a/k/a "Roger," the defendant, and Wholesaler-1 in Utah.  CROWELL, CC-1 and others at Wholesaler-1 then caused these drugs to be shipped to pharmacies all over the country, including Manhattan and the Bronx, so that the drugs could be dispensed as new to unsuspecting patients.

26.  To facilitate the scheme, RANDY CROWELL, a/k/a "Roger," the defendant, and other scheme participants also placed and received interstate telephone calls, sent and received interstate facsimiles and e-mails, and sent and received interstate wire transfers.  In addition, the processes used to reimburse pharmacies for the cost of the prescription drugs and otherwise to administer Medicaid and other health benefit programs involved various wire transmissions.

27.  As a further part of the scheme, RANDY CROWELL, a/k/a "Roger," the defendant, opened and controlled various bank accounts, including accounts opened in the name of Wholesaler-1, that he used to make payments to co-conspirators, including CC-2, for the receipt of illegitimate medications, and to receive payments from pharmacies and other purchasers of these medications.  During the period of the charged conspiracy, CROWELL caused more than $140 million to be moved into and out of these accounts.

28.   RANDY CROWELL, a/k/a "Roger," the defendant, and other scheme participants frequently designed and structured transactions so as to conceal the fact that the proceeds were from the fraudulent scheme describe above.   For example, CROWELL frequently paid CC-2 indirectly, through various corporate entities under CROWELL's control in order to conceal the fact that CROWELL was purchasing these medications from illegitimate sources.   Similarly, CC-2 frequently changed the names and license holders for the Corrupt Distribution Companies and other corporate entities under his control so as to evade detection.

29.   Between in or about 2010 and in or about July 2012, RANDY CROWELL, a/k/a "Roger," the defendant, paid more than $100 million for illegitimate medications purchased from the Corrupt Distribution Companies and other illegitimate sources, drugs that health care benefit programs ultimately paid full price for under false pretenses. For his role in orchestrating the activities of Wholesaler-1, CROWELL reaped approximately $16 million in profits.

<u>STATUTORY ALLEGATIONS</u>

30.   From at least in or about 2010 through in or about July 2012, in the Southern District of New York and elsewhere, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to violate Title 18, United States Code, Section 1347.

31.   It was a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises money and property owned by and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

(Conspiracy to Commit Mail and Wire Fraud)

The Grand Jury further charges:

32.   The allegations contained in paragraphs 1 through 29 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

33.   From at least in or about 2010 through in or about July 2012, in the Southern District of New York and elsewhere, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1341 and 1343.

34. It was a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

35. It was further a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for

17

obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

COUNT THREE

(Conspiracy to Defraud the United States and to Commit False Pedigree, Unlawful Wholesale Distribution, Misbranding and Adulteration Offenses)

The Grand Jury further charges:

36.   The allegations contained in paragraphs 1 through 29 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

37.   From at least in or about 2010 through in or about July 2012, in the Southern District of New York and elsewhere, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency thereof, and to commit offenses against the United States, to wit, to violate Title 21, United States Code, Sections 331(a), 331(c), and 333(a)(2).

### Objects of the Conspiracy

38.   It was a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did introduce and deliver for introduction into interstate commerce a drug that was misbranded and adulterated, as those terms are defined in Title 21, United States Code, Sections 351(a) and 352(a) & (i), in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

39.   It was further a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did receive in interstate commerce a drug that was misbranded and adulterated, as those terms are defined in Title 21, United States Code, Sections 351(a) and 352(a) & (i), and would and did deliver and proffer delivery thereof for pay and otherwise, in violation of Title 21, United States Code, Sections 331(c) and 333(a)(2).

### Overt Acts

40.   In furtherance of the conspiracy and to effect the illegal objects thereof, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

19

     a.   On or about December 23, 2010, CROWELL caused a shipment of medications to be sent from Wholesaler-1, in St. George, Utah, to a pharmacy in the Bronx, New York, knowing that these medications were misbranded and adulterated.

     b.   On or about December 1, 2011, two co-conspirators not named as defendants herein, delivered boxes containing 301 bottles of the HIV medication Kaletra, substantially all of which had been purchased from Insurance Beneficiaries on the streets of New York and New Jersey, to a commercial interstate carrier in Secaucus, New Jersey for shipment to one of the Corrupt Distribution Companies under CC-2's control for ultimate sale to CROWELL and Wholesaler-1.

     c.   On or about March 1, 2011, CROWELL signed a pedigree as the owner of Wholesaler-1 which contained false information about the origin of prescription medications being sold by Wholesaler-1 to a pharmacy located in Fairhaven, Massachusetts.

     d.   On or about December 9, 2010, CROWELL signed a pedigree as the owner of Wholesaler-1 which contained false information about the origin of prescription medications being sold by Wholesaler-1 to a pharmacy located in the Bronx, New York.

     (Title 18, United States Code, Section 371.)

## COUNT FOUR

(Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

41.   The allegations contained in paragraphs 1 through 29 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

42.   From at least in or about 2010, up to and including in or about July 2012, in the Southern District of New York and elsewhere, RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

43.   It was a part and an object of the conspiracy that RANDY CROWELL, a/k/a "Roger," the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the healthcare fraud, wire fraud, and mail fraud offenses alleged in Counts One and Two of this Indictment, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified

unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

44.  As a result of committing the healthcare fraud offense alleged in Count One of this Indictment, RANDY CROWELL, a/k/a "Roger," the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense alleged in Count One.

45.  As a result of committing one or more of the healthcare fraud, wire fraud, or mail fraud offenses alleged in Counts One and Two of this Indictment, RANDY CROWELL, a/k/a "Roger," the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property, real and personal, constituting, or derived from, proceeds traceable to the offenses charged in Counts One and Two.

46.  As a result of committing the money laundering offense charged in Count Four of this Indictment, RANDY CROWELL, a/k/a "Roger," the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all property, real and

personal, involved in said offenses and all property traceable to such property.

### Substitute Assets Provision

47.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.  cannot be located upon the exercise of due diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other described forfeitable property.

        (Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
UNITED STATES ATTORNEY

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

RANDY CROWELL,
a/k/a "Roger,"

Defendant.

SEALED
INDICTMENT

15 Cr.

(18 U.S.C. §§ 371, 1349, 1956.)

PREET BHARARA
United States Attorney.

A TRUE BILL

*Yolanda Ocasio*

Foreperson.

12/3/15

Filed Sealed Indictment
Filed Arrest Warrants

on                    Judge Netburn